**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **ANTHONY WOMICK, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE KROGER COMPANY,**<br><br>**Defendant.** | **Case No. 3:21-CV-00574-NJR** |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

After more than five years of litigation, this putative class action has reached the all-important class certification stage. Plaintiff Anthony Womick ("Womick") asks the Court to certify multistate and Illinois consumer fraud classes of Plaintiffs who were allegedly duped by quantitative representations on the labels of ground coffee products sold by Defendant The Kroger Company ("Kroger"). (Doc. 88). Kroger, in addition to opposing class certification, has moved to exclude the opinions of Womick's class certification experts, Dr. Tony Schmitz, Dr. Christopher Hendon, Dr. Ramamirtham Sukumar, and Mr. Justin Blok (Docs. 96, 97), under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

While class certification may be the main event, it cannot proceed without a warmup act. Kroger's motions to exclude the opinions of Womick's class certification experts are just that. Because Womick's experts offer testimony that is "critical to class certification," *American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010),

the Court cannot address his class certification motion without first resolving Kroger's challenges to the admissibility of his experts. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 813 (7th Cir. 2012) ("[W]henever an expert's report or testimony is critical to a class certification decision, a district court must rule conclusively on a challenge to the expert's qualifications or opinions before ruling on class certification, without regard to whether the district court ultimately grants or denies that motion."). Accordingly, the Court will consider Kroger's *Daubert* motions (Doc. 96, 97) before turning to Womick's motion for class certification (Doc. 88).

As explained below, the Court finds that few of Kroger's *Daubert* challenges have merit. The Court also is satisfied that a class of Illinois purchasers may be certified under Rule 23(b)(3), but it denies Womick's request to certify a class of purchasers from other states.

## BACKGROUND

Kroger operates more than 2,000 grocery stores across the country, including more than 100 in Illinois. (Plaintiff's Statement of Facts at ¶ 1, Doc. 88). Among other things, it manufactures and sells several versions of its house brand ground coffee in canisters. At the time relevant to this case, the canisters (the "Class Products") stated the number of cups of coffee that could be brewed from their contents. (First Amended Complaint at ¶¶ 12, 13 ("FAC") (Doc. 68)). Kroger-brand coffee is sold in various sizes—including 11.5 oz., 24 oz., 25 oz., 29 oz., and 30.5 oz.—and various flavors—including Breakfast Blend Mild Roast, 100% Colombian Medium Dark Roast, Decaf Classic Medium Roast, French Roast, Premium Blend Medium Roast, Reduced Caffeine Lite Medium Roast,

Select Brand Medium Roast, Special Roast Medium Roast, and Supreme Blend Medium Roast. (*Id.* ¶ 14).

This case is about the quantitative representations on the coffee canisters. The packaging states, as illustrated below, that each canister yields an approximate number of servings (*i.e.*, brewed cups of coffee):




(*Id.* ¶ 15). The cup yield of each canister depends on its size as follows:

- The 11.5 oz. (326 g) canisters represent they can make about 90 cups.
- The 24 oz. (680 g) canisters represent they can make about 185 cups.
- The 25 oz. (708 g) canisters represent they can make about 195 cups.
- The 29 oz. (822 g) canisters represent they can make about 225 cups.
- The 30.5 oz. (864 g) canisters represent they can make about 235 cups.

(*Id.* ¶ 17).

Kroger offers two suggested brewing methods (the "Brewing Instructions"). (*Id.* ¶ 19). To make one cup of coffee, the Brewing Instructions suggest a ratio of one round tablespoon of ground coffee to six fluid ounces of cold water. (*Id.*). To make ten cups of coffee, consumers are directed to use a half cup of ground coffee. (*Id.*). Womick believes that Kroger's quantitative representations regarding cup yields are false and

misleading because when following the Brewing Instructions, the canister's contents are exhausted before one can brew the claimed number of cups of coffee. (*Id.* ¶¶ 19-21).

Womick seeks certification of a class comprised of the purchasers of eight Kroger-brand coffee products that he says misrepresent their actual yield:

- Medium Roast Select Blend (30.5 oz.)
- Medium Roast Supreme Blend (29 oz.)
- Medium Roast Special Roast (29 oz.)
- Medium Roast 50% Less Caffeine Lite (24 oz.)
- Medium Roast Premium Blend (11.5 oz. and 29 oz. sizes)
- Medium Roast Decaf Classic (11.5 oz. and 25 oz. sizes)

(Doc. 88, ¶ 3).

Womick testified at his deposition that he purchased Kroger's Select and Supreme Blend coffee canisters after reviewing their labels. (Womick dep., Doc. 98-1, pp. 52, 57-58). When he saw the label's statement about the number of cups that would be yielded, he thought it "represented value" and that the package would yield "225 or 235 cups." (*Id.* at p. 57). He would typically brew a ten-cup pot of coffee using a half-cup of ground coffee. (*Id.* at p. 60). At some point, he felt that the product "wasn't going as far as . . . it should," so he stopped purchasing it. (*Id.* at p. 44). He later spoke with a friend who put him in touch with an attorney. (*Id.* at pp. 41-42).

Womick filed this lawsuit in the Circuit Court for the Third Judicial Circuit in Madison County, Illinois, on May 12, 2021. Kroger thereafter removed the case to this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). On March 7, 2022, the Court permitted Womick's unjust enrichment and Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA") claims to proceed over

Kroger's motion to dismiss. (Doc. 27). Womick later amended his complaint to add claims arising under the laws of Illinois and 21 additional states.[1] (Doc. 68). The Court later denied Kroger's motion to dismiss these claims on Article III standing grounds. (Doc. 81).

## EXPERT ADMISSIBILITY CHALLENGES

1. <u>Legal Standard</u>

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702. The district court acts as a "gatekeeper" to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. *Daubert* provides four non-exhaustive considerations that bear on this inquiry: (1) whether a "theory or technique . . . can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known

---

[1] The proposed multistate class is comprised of purchasers from Illinois, Alabama, Alaska, Arizona, California, Colorado, Florida, Kansas, Kentucky, Michigan, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oregon, South Carolina, Tennessee, Virginia, and Washington.

or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation;" and (4) whether the theory or technique has found "general acceptance" within the scientific community. *Id.* at 593-94. This standard applies to all forms of expert evidence, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), and the proponent of the evidence "bears the burden of demonstrating that [it] satisfies [Rule 702] by a preponderance of the evidence." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Ultimately, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

District courts in the Seventh Circuit conduct a three-step analysis before admitting expert testimony. They "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotation marks omitted). In short, the Court must evaluate (i) the proffered expert's qualifications, (ii) the reliability of her methodology, and (iii) the relevance of her testimony. *Id.*

Ultimately, the focus of a *Daubert* inquiry is not the correctness of the expert's conclusions, but rather, the principles and methodology she relied on to arrive at her conclusions. *Daubert*, 509 U.S. at 595; *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). Accordingly, the Court will evaluate the opinions of Womick's class

certification experts to determine whether they formed them with the requisite "soundness and care." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

2. Analysis

*a. Dr. Tony Schmitz*

Dr. Schmitz is a highly credentialed metrologist (measurement scientist). He offers a "measurement procedure for half-cup coffee mass measurements" related to the six flavors of Kroger brand ground coffee at issue in this case: Medium Roast Select Blend, Medium Roast Supreme Blend, Medium Roast Decaf Classic, Original, Special Roast, and Half Caff.[2] (Schmitz Report, Doc. 88-9, p.3). He conducted 100 measurements per flavor, consisting of ten measurements from ten separate canisters, except for Half Caff, for which he obtained 40 measurements from four canisters. (*Id.*). Based on these measurements, Dr. Schmitz calculated a "mean mass" of half-cup measurements for all six flavors, which came out to 38.71 grams (*i.e.*, 38.71 grams per half cup). (*Id.*, p. 3-4). In calculating this mean mass, Dr. Schmitz also found that "[m]easurement variation within each flavor was minimal and within the expected experimental range," as shown in the table below:

| Flavor | Mean (g) | Uncertainty in mean (g) |
|---|---|---|
| Medium Roast Select Blend | 38.99 | 0.10 |
| Medium Roast Supreme Blend | 39.57 | 0.07 |
| Medium Roast Classic | 38.19 | 0.08 |
| Original | 38.55 | 0.06 |
| Special Roast | 39.35 | 0.07 |
| Half Caff | 38.43 | 0.07 |

[2] Womick's proposed class is comprised of eight products because two of the flavors were sold in multiple sizes.

(*Id.* at p. 4). The "uncertainty in mean" column identifies the likely proximity of the sample measurements to the mean measurements of the entire population of these six flavors. (*Id.* at p. 3 n.3). This is an important qualifier because, as Dr. Schmitz explains, "[i]t is impossible to measure every item in the population (called the 'parent distribution')—here, every canister [of the tested flavors] ever produced." (*Id.*).

Based on these measurements and the results he obtained, Dr. Schmitz concluded that "the mean mass values obtained from testing the six flavors (*i.e.*, the samples) reliably represent the mean mass values of the parent (*i.e.*, total) distributions." (*Id.*, p. 10). In other words, Dr. Schmitz believes that, based on the measurements he conducted, the mean mass results he obtained for the six flavors can be reliably extrapolated to all Kroger ground coffee products of those flavors. (*Id.*).

i. Qualifications

Kroger contests Dr. Schmitz's qualifications on the basis that his metrological expertise is too general to enable him to competently address the issues in this case. Dr. Schmitz's background in machine tool metrology, according to Kroger, has nothing to do with food products and culinary measurements. Therefore, Kroger argues, Dr. Schmitz lacks the specific qualifications to offer an opinion about how ground coffee should be reliably measured.

The Seventh Circuit does not demand *perfect* alignment between an expert's qualifications and the issues in the case. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). Rather, an expert's qualifications under Rule 702 are based on his "full range of practical experience as well as academic or technical training," and not on the presence or absence

of a specific area of specialization. *Smith*, 215 F.3d at 718; *see also In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 824 (S.D. Ill. 2024) ("Whether an expert is qualified to testify under Rule 702 does not depend on her ability to check certain boxes on a list of required credentials."). Thus, if an expert's educational, professional, or academic credentials relate to the topic of his testimony, a lack of specialization does not automatically disqualify him from testifying. *See Gayton*, 593 F.3d at 617.

*Gayton* provides an instructive and binding framework. There, the court found that a general practice physician was qualified to testify about the death of a prison inmate who had died of "non-specific heart failure." *Id.* at 619. The fact that the physician was not a cardiologist, the court explained, did not preclude him from testifying that the lack of care the decedent had received for extreme vomiting contributed to her preexisting heart failure and therefore, her untimely death. *Id.* at 617. Such testimony was well within the scope of the physician's expertise because it was "knowledge that any competent physician would typically possess." *Id.* at 618. So, although the critical issue in the case concerned a death brought on by a heart condition, the physician's lack of specific practice expertise as a cardiologist did not warrant the wholesale exclusion of his testimony.[3] *Id.* at 619.

Kroger offers no authority for the proposition that generalized measurement science expertise cannot be applied to food products without further specialization. Nor

[3] The court did find that the physician was not qualified to testify that the decedent would have survived if she had been given her cardiac medications by prison officials. *Gayton*, 593 F.3d at 618. This testimony was properly excluded because the physician "d[id] not have specialized cardiac or pharmacological knowledge upon which to base his conclusion that these drugs had a reasonable probability of saving her life if taken in the days before her death." *Id.*

does Kroger explain why such specialization would be needed as a prerequisite to qualification under Rule 702. Even a cursory review of Dr. Schmitz's background demonstrates his expertise on matters of measurement. He has 25 years of research, application, and educational experience in the study of metrology. He has a PhD from the University of Florida focused on machine tool metrology, instrument design, and the measurement of dynamic machine tool error motions using laser interferometry. He also established a training program called America's Cutting Edge, through which he offers a course in metrology that "provides fundamental instruction on measuring instruments, their use, and uncertainty analysis for measurement data." (Doc. 88-9, p. 4).

Kroger's argument regarding the need for food-specific qualifications requires one to overlook Dr. Schmitz's extensive track record as a metrologist. Thus, the Court does not find the argument persuasive. Dr. Schmitz's proffered testimony is limited to *measurements*. It does not concern the chemical makeup of coffee in general or the Class Products in particular. As such, Dr. Schmitz's proffered testimony is well within the bounds of his qualifications as a metrologist. And because measurements are the basis for his opinions, he is qualified to offer them, as was the general physician in *Gayton* who opined on the decedent's heart-related death.

ii. Reliability

Kroger contests the reliability of Dr. Schmitz's measurement methodology on the basis that he failed to control for certain variables in his measurements. It argues that Dr. Schmitz's measurements are unreliable because he conducted them at home without accounting for humidity and ambient temperature, and without considering the lot

numbers or production dates of the coffee particles he measured. These omissions, Kroger avers, render Dr. Schmitz's mean mass measurements incapable of extrapolation to the broader universe of Class Products because mass measurements are inherently sensitive to these variables.

Kroger is incorrect that Dr. Schmitz simply ignored the impact of environmental variables. Dr. Schmitz assumed, based on Womick's counsel's representations, that "the flavors of Kroger brand ground coffee products being tested are respectively uniformly manufactured, roasted, ground, and packaged using identical methods and equipment at a single facility." (Doc. 88-9, p. 3). Nothing in Rule 702 precluded him from making this assumption based on counsel's representations. *See United States v. SuperValu, Inc.*, No. 11-3290, 2019 WL 1277031, at *5 (C.D. Ill. Mar. 20, 2019) (holding that "an expert may render an opinion that is based on information provided by counsel."). Here, counsel's representations allowed Dr. Schmitz to assume the physical and chemical uniformity of the products he examined, without undermining the reliability of his measurement methodology. And as an expert in *measurements*—as opposed to the product being measured—this was a reasonable assumption for Dr. Schmitz to make. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) (approving expert's reliance on representations by counsel under Rule 702). Notably, Kroger's food science expert, Ms. Becki Holmes, did not offer an opinion regarding the extent of the impact of the variables Kroger identifies. (Doc. 96-3, pp. 3-4). The Court finds that Kroger's concerns can be addressed on cross-examination and do not preclude the admissibility of Dr. Schmitz's opinions.

iii. Relevance

Kroger also attacks the relevance of Dr. Schmitz's opinions on the basis that he never personally brewed any coffee. Thus, Kroger avers, his testimony is not helpful to the jury—presumably because they would not be able to draw any conclusions regarding the ultimate coffee cup yield of the Class Products.

This argument is waived because it is presented in a perfunctory manner without authoritative support. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (explaining that "perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.") (quotation marks omitted). Even if it were not, it would carry little persuasive force. Dr. Schmitz does not intend to testify regarding the Class Products' ultimate coffee cup yield—that is a topic addressed by other experts. Dr. Schmitz, as noted, is a measurement scientist. Whether Dr. Schmitz ever brewed coffee himself is irrelevant to the question of whether his measurements may be helpful to the jury. And they certainly are because they address the potential quantitative shortcomings of the Class Products. *See Daubert*, 509 U.S. at 592 (explaining that relevance depends on whether there is a "valid scientific connection to the pertinent inquiry.").

Finally, Kroger attempts to undercut the relevance of Dr. Schmitz's proffered testimony by pointing out his failure to account for the "physical and chemical properties of the coffee particles themselves" or the "spatial arrangements of those particles in the measurement vessel." These questions and criticisms may go to the weight of Dr. Schmitz's opinions—for instance, one might argue that the chemical properties of the

Decaf Classic Medium Roast vary from those of the French Roast and that this chemical variability renders Dr. Schmitz's measurements substantively unsound. But those issues have little to do with the *relevance* of his testimony. Dr. Schmitz's testimony is therefore admissible under Rule 702.

*b. Dr. Christopher Hendon*

Dr. Hendon offers an opinion that six flavors of the Class Products (the same six flavors that Dr. Schmitz analyzed) are unable to produce the number of cups of brewed coffee shown on the labels when following the Brewing Instructions. (Hendon Report, Doc. 88-10, pp. 3-4). After identifying a yield shortage, Dr. Hendon calculated the extent of the shortage for each of the six flavors. (*Id.*, p. 4).

Dr. Hendon's yield review began with the stated net mass in grams shown on each canister of the six Kroger coffee flavors he examined. (*Id.*). He then considered the quantitative suggestions in the Brewing Instructions, which call for the use of either "one rounded tablespoon" of ground coffee for six fluid ounces of water to generate one cup of brewed coffee (the one-cup method), or one-half cup of ground coffee to brew ten cups (the ten-cup method).[4] (*Id.*, pp. 2, 5).

Dr. Hendon relied on Dr. Schmitz's measurements of the mean mass of one-half cup of each of the six coffee flavors, which ranged from 38.19 grams to 39.57 grams, as noted in the table above. (*Id.*). He then calculated the mass of a flat tablespoon for each of

[4] As to the one-cup method, Dr. Hendon used a flat tablespoon instead of a round one because it provided a more "conservative[]" basis for his calculations. (Hendon Report, Doc. 88-10, p. 5). A flat tablespoon, according to Dr. Hendon, carries less product than a round tablespoon. (*Id.*, p. 4). Thus, his use of a flat tablespoon would be expected to generate a higher brewed coffee cup yield because each tablespoonful required less product. (*Id.*).

these products by dividing Dr. Schmitz's half-cup mean measurements by eight. Dr. Hendon relied on the U.S. Department of Agriculture's Measurement Conversion Table to determine the basis of his calculation of one half-cup by eight.[5] (*Id.*). The resulting mean flat tablespoon mass measurements ranged from 4.77 grams to 4.95 grams. (*Id.*). And based on these calculations, Dr. Hendon calculated the number of cups of coffee that can be made from each canister of ground coffee according to the one-cup brewing method and the ten-cup brewing method. (*Id.*). For the ten-cup method, Dr. Hendon divided the mass displayed on the canister by the mean half-cup mass for the flavor in question and then multiplied that number by ten. (*Id.*, p. 5-6). For the one-cup method, Dr. Hendon calculated the canister's alleged actual yields by dividing the mass displayed on the canister by the mass of a flat tablespoon. (*Id.*). Both of these calculations demonstrated a yield shortage, with the one-cup method generating a more substantial deficit. Dr. Hendon recorded his yield measurements in the following table:

[5] *Available at* U.S. Dept. of Agri., *Measurement Conversion Tables*, https://www.ars.usda.gov/northeast-area/beltsville-md-bhnrc/beltsville-human-nutrition-research-center/methods-and-application-of-food-composition-laboratory/mafcl-site-pages/measurement-conversion-tables/, (last visited Sept. 28, 2026).

**Table 1**

| Coffee Product | Mass of 1/2 cup (g) | Mass of flat tablespoon (g) | Stated mass in canister (g) | Stated cup yield | Actual number of cups yielded using 1/2 cup | Underfill (cups) | Percent underfill | Actual number of cups yielded using flat tablespoon | Underfill (cups) | Percent underfill |
|---|---|---|---|---|---|---|---|---|---|---|
| Supreme Blend | 39.57 | 4.95 | 822 | 225 | 208 | -17 | 7.7% | 166 | -59 | 26.1% |
| Special Roast | 39.35 | 4.92 | 822 | 225 | 209 | -16 | 7.2% | 167 | -58 | 25.7% |
| Select Blend | 38.99 | 4.87 | 864 | 235 | 222 | -13 | 5.7% | 177 | -58 | 24.6% |
| Premium Blend | 38.55 | 4.82 | 822 | 225 | 213 | -12 | 5.2% | 171 | -54 | 24.2% |
| | | | 326 | 90 | 85 | -5 | 6.0% | 68 | -22 | 24.8% |
| Decaf Classic | 38.19 | 4.77 | 708 | 195 | 185 | -10 | 4.9% | 148 | -47 | 23.9% |
| | | | 326 | 90 | 85 | -5 | 5.2% | 68 | -22 | 24.1% |
| 50% Less Caffeine Lite | 38.43 | 4.80 | 680 | 185 | 177 | -8 | 4.4% | 142 | -43 | 23.5% |

Dr. Hendon's proffered testimony is inadmissible under Rule 702 because it offers nothing of value to a jury. The rule explains this requirement simply: an expert's proffered testimony may not be admitted unless it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Here, Dr. Hendon, notwithstanding his stellar credentials as a coffee science expert, did little more than simple math. His report demonstrates as much. He took Dr. Schmitz's mean mass measurements for the half cups of ground coffee from the six flavors under consideration, divided that number by eight for each flavor to identify a mean tablespoon mass, and then divided the canister's displayed mass by the tablespoon mass. This formula demonstrated that the one-cup method yielded only 166 brewed cups of the Supreme Blend, rather than the 225 cups that the canister claims to produce. The same is true of his evaluation of the ten-cup method. There, he simply divided the mass displayed on the canister by the mean mass of the half cup measured by Dr. Schmitz and then multiplied that number by ten. Based on this calculation, he found an actual yield of

208 brewed coffee cups of the Supreme Blend as opposed to 225.

It is well-settled that "[f]or expert testimony to be admissible, the expert must have something useful to say about the particular circumstances at issue." *Downing v. Abbott Labs.*, 48 F.4th 793, 810 (7th Cir. 2022) (internal quotation marks omitted). Here, it appears plain that a layperson can conduct the same calculations that Dr. Hendon made. His testimony, in other words, would not illuminate a complex issue that is beyond a layperson's understanding. Accordingly, his testimony will be excluded. *See Fields v. Withoff*, No. 3:12-cv-1170, 2015 WL 5174000, at *2 (S.D. Ill. Sept. 2, 2015) (denying motion for medical expert discovery because the issues on which expert would testify were not beyond the common understanding of laypersons).

*c. Mr. Justin Blok*

Mr. Blok is Womick's economic damages expert. He examined Womick's and the putative class members' damages based on the alleged quantitative shortfalls in the Class Products multiplied by a numerical representation of the market's willingness to pay ("MWTP") per cup of coffee. (Blok Report, Doc. 88-7, p. 5). Thus, Mr. Blok offers a methodology for calculating classwide damages based on the class members' "overpayment" for the Class Products due to Kroger's alleged misrepresentations. (*Id.* at p. 7).

Mr. Blok's expert analysis relies on Dr. Hendon's calculations of the cup shortages derived from the six flavors and various canister sizes he examined and on a "conjoint

analysis" to be performed by Dr. Sukumar, which will identify the MWTP.[6] (*Id.* at p. 7). From there, he utilizes Kroger's sales data to calculate the number of canisters sold as a basis for estimating class wide damages. (*Id.* at p. 12). Because Dr. Sukumar's conjoint analysis has apparently not been performed yet, Mr. Blok's economic damages assessment is incomplete. Nevertheless, he offers an opinion that "the Class Members suffered actual damages as a result of Kroger's alleged actions, and the damages sustained are quantifiable." (*Id.* at p. 11). So, even without the numerical inputs that Dr. Sukumar intends to offer, Mr. Blok proffers an opinion that "[t]he discrepancy between the stated and actual yield translates to a shortfall in cups per Class Product . . . which can be valued using the MWTP per cup." (*Id.*). His methodology calculates actual damages, statutory damages, and treble damages, depending on each category's availability under state law. (*Id.*).

i. Qualifications

Mr. Blok is a partner at the accounting and advisory firm Whitley Penn LLP, where he serves as a managing director in its Forensic, Litigation & Valuation Services practice. He earned his bachelor's degree in business administration from Baylor University and a master's degree in business administration from the University of Houston. He also

[6] The MWTP, a figure computed by Womick's consumer survey expert Dr. Ramamirtham Sukumar, had not been calculated as of the date of Mr. Blok's expert report. (Blok Report, Doc. 88-7, p. 7). Thus, much of Mr. Blok's damages calculations were unexecuted when he submitted his report because the MWTP was a "necessary" variable in this analysis. (*Id.*). This does not preclude an analysis of the admissibility of Mr. Blok's and Dr. Sukumar's opinions at this stage of the case. *See e.g.*, *O'Connor v. Ford Motor Co.*, No. 19-cv-5045, 2026 WL 579329, at *7 (N.D. Ill. Mar. 2, 2026) (rejecting an argument that a proposed conjoint analysis should be excluded because it had not been completed by the class certification stage); *In re Fluidmaster, Inc., Watter Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *28 n.21 (N.D. Ill. Mar. 31, 2017) (finding that *Daubert* does not require the completion of a conjoint survey by the class certification stage).

holds a master's in accounting from the University of North Carolina at Chapel Hill. Mr. Blok has extensive experience with damages quantification issues in complex commercial disputes and has testified as an expert in state and federal court on economic damages issues related to intellectual property and contract disputes, as well as general business transactions. Kroger contests Mr. Blok's qualifications to offer his proffered damages calculations on the basis that he has no experience valuing consumer claims.

The Court is not persuaded that the lack of a tailored consumer claims background renders Mr. Blok unqualified to offer his opinions. "The notion that *Daubert* requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (citation modified). "Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Id.* So, just as "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats," *Gayton*, 593 F.3d at 617, so too may they find that an economic damages expert is qualified to testify to consumer claims even though his experience is in general business transactions.

Mr. Blok's report makes clear that he examined Kroger's sales data in connection with the Class Products, the quantitative shortfalls of the Class Products, and the forthcoming MWTP figures from Dr. Sukumar's proposed conjoint analysis as a basis for his classwide damages opinion. The Court is confident that these tasks are well within the range of Mr. Blok's qualifications. *See Taylor v. Union Pac. R. Co.*, No. 09–123, 2010 WL 3724287, at *2 (S.D. Ill. Sept. 16, 2010) ("[A]n expert need not have credentials narrowly

tailored to the subject matter of a case in order to pass muster under Rule 702, so long as the expert is testifying to matters within the area of his or her expertise.").

ii. Reliability

Kroger also contests the reliability of Mr. Blok's opinions because he makes use of the opinions of Drs. Hendon and Sukumar, whose opinions, Kroger thinks, are themselves unreliable. Although the Court has determined that Dr. Hendon's opinions must be excluded, that does not disqualify Mr. Blok. He, like any juror, can easily replicate Dr. Hendon's simple mathematical calculations. The reliability of Mr. Blok's damages calculations is therefore unaffected by the exclusion of Dr. Hendon's opinion. And, as explained more fully below, the Court finds that Dr. Sukumar's opinions are sufficiently reliable under Rule 702. Accordingly, the Court disagrees with Kroger's assertion that Mr. Blok's proffered testimony is inadmissible due to his reliance on the opinions of Drs. Hendon and Sukumar.

iii. Relevance

Kroger's final argument against the admission of Mr. Blok's testimony is that it is unhelpful to a jury because he supposedly "concedes that consumers can conceptually experience different 'shortfalls' based on the [brewing] method they use." (Doc. 96, p. 16). Therefore, Kroger argues, Mr. Blok cannot help demonstrate the presence of common questions and their predominance over individual ones under Federal Rule of Civil Procedure 23. This argument is similarly brief and unsupported by relevant authority. *See Rock Hemp Corp.*, 51 F.4th at 704.

Even if the brevity of this argument does not result in its waiver, it appears to

mischaracterize Mr. Blok's testimony. Mr. Blok, as noted, intends to offer certain damages calculations that, in his view, can be applied on a classwide basis, subject to the damages standards under the laws of the various states whose consumers make up the two proposed classes. In his words, Mr. Blok offers a "method to calculate class-wide actual damages of Class Members based upon their overpayment for Class Products due to Kroger's alleged wrongful conduct." (Doc. 88-7, p. 7). The results of these calculations lie at the very heart of this action. It is therefore incorrect to assert that Mr. Blok's testimony would be unhelpful to a jury, regardless of whether they are ultimately *persuaded* by it.

Accordingly, the Court finds that Mr. Blok's proffered expert testimony is admissible under Rule 702.

*d. Dr. Ramamirtham Sukumar*

In a separate motion, Kroger challenges the opinions of Dr. Sukumar. He is the Chief Executive Officer of Optimal Strategix Group, Inc., a consulting company that conducts market research. Kroger does not take issue with Dr. Sukumar's qualifications (and the Court agrees that he is qualified to render his opinions in this matter). Rather, Kroger challenges the reliability of Dr. Sukumar's opinions, which are set out in the two initial reports he prepared for this case.

In his first report, titled Consumer Materiality and Perception (Doc. 88-8), Dr. Sukumar sought to test the importance of the "number of cups a coffee that can be made from a canister of ground coffee" and the label stating this number of cups to consumer purchasing decisions. (Doc. 88-8, pp. 5, 7). His firm conducted a consumer survey to attempt to answer these questions. After answering demographic questions,

survey respondents were asked to allocate 100 points to various factors "based on their importance in your purchasing decision." (*Id.* at p. 8). The list included attributes such as "number of cups that can be made from the canister," flavor, and the reputation of the coffee brand. (*Id.*). Respondents who indicated that the number of cups that could be made from a canister was important to their purchasing decision then were asked to rate the importance of including the number of cups on the label on a scale of one to five, where one was not important at all, and five was extremely important. (*Id.* at p. 10).

Next, respondents were shown images of Kroger-brand coffee canisters and asked whether they believed they would be able to make the number of cups of coffee listed on the label. (*Id.*). If they responded that they did not, they were then asked whether they thought they would be able to make the stated number of cups using either of the brewing instructions on the back of the label. (*Id.* at p. 11). Dr. Sukumar reports that 813 individuals who have purchased ground coffee to brew at home from a grocery store completed the survey. (*Id.*).

Kroger criticizes multiple aspects of Dr. Sukumar's materiality survey. First, it observes that Dr. Sukumar measures how important it is to a consumer for a coffee canister label to include (or not) a cup representation *at all* rather than the materiality of any overstatement of the claim to a consumer's purchasing decision, which is one of the common questions Womick identifies in this case. Womick responds that this argument conflates the issue of materiality with causation and damages; materiality focuses on whether the challenged representation is of import to consumers, while the degree of importance of an overstatement goes to a consumer's damages.

As Womick notes in his brief, a relevant question for purposes of an ICFA deceptive practices claim is whether an alleged misrepresentation concerned a *material* fact. *See* 815 Ill. Comp. Stat. 505/2; *Crawford v. Arizona Beverages USA LLC*, No. 22-CV-220-DWD, 2024 WL 1345648, at *4 (S.D. Ill. Mar. 30, 2024). "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 505, 675 N.E.2d 584, 595 (1996). The core of Womick's claim is that the labels at issue overstated the number of cups of coffee a purchaser could yield from each class product. A fact-finder will have to resolve whether the represented coffee yield of the Class Products is "the type of information upon which a buyer would be expected to rely." *Connick*, 174 Ill. 2d at 505, 675 N.E.2d at 595.

After reviewing Dr. Sukumar's survey, the Court believes several of his questions would provide relevant information to that inquiry. He asked respondents to score the importance of the "number of cups of coffee that can be made from the canister." (Doc. 88-8, p. 9). Although this may not be a perfect proxy for whether a consumer would expect to rely on such information, a fact-finder could rationally conclude that a high number of favorable responses to this question supports materiality. Dr. Sukumar also asked respondents whether, after reviewing the Class Products' labels, they believed they could make the stated number of coffee cups using the provided brewing instructions. (*Id.* at p. 10). Evidence that many consumers did not think so might suggest that the representations were not material to their purchasing decision.

Kroger also accuses Dr. Sukumar of reporting misleading results from the survey. It notes that he reported that 77.0% of respondents "indicated that the number of cups of coffee that can be made from the canister has importance to their purchasing decision for ground coffee canisters." (*Id.* at p. 12). However, according to Kroger, this figure includes anyone who allocated more than zero points to the "number of cups" attribute in response to his first survey question. Thus, his statement fails to account for other factors that respondents might have rated as more important. Kroger also says that he "overstates that 98.4% of respondents consider inclusion of the number of cups on the label as important to their purchasing decision." (Doc. 97, p. 7).[7] The Courts finds that these are concerns regarding how Dr. Sukumar summarized the *results* of his survey that can be addressed on cross-examination and do not merit exclusion.

Kroger also identifies aspects of Dr. Sukumar's survey that it says render the results unreliable. It alleges that the coffee canister labels he showed respondents were modified to omit portions of the real-world label, including the Kroger brand name, its quality guaranty, storage information, and brewing tips, meaning that the labels bore little resemblance to what consumers would encounter in stores. But Dr. Sukumar notes in his rebuttal report that "[t]he neutralization of brand names and simplification of label stimuli is an accepted practice in consumer perception research when the purpose is to isolate consumer interpretation of specific claims from the effects of brand recognition

[7] Kroger misstates Dr. Sukumar's conclusion. He reported that 98.4% of "such respondents"—referring to those who had allocated points to "number of cups" in the previous question—indicated that the inclusion of that figure on a package label was at least of some importance to their purchasing decision. (Doc. 88-8, p. 12).

and visual clutter." (Doc. 106-1, p. 4). The disputed question asked respondents whether they believed they would be able to make the stated number of cups of coffee based on the canister's label. (Doc. 88-8, p. 10). Dr. Sukumar's explanation for his choice to simplify the labels is cogent, and the Court, after reviewing the modified labels, does not find that they are so different from the actual packaging as to render unreliable the responses to the specific question at issue.

Next, Kroger says that the survey includes leading questions and suggestive elements that undermine its reliability. But the Court is not convinced that any of the issues Kroger identifies, alone or in combination, so undermine the survey's reliability that it must be excluded, and certainly not in its entirety. Kroger first points out that the second question respondents saw after reviewing the product labels was worded nearly identically to the first and shown only to respondents who had previously answered "No," creating possible "demand effects" that would encourage an affirmative response. Dr. Sukumar noted, however, that this sequence served a valid methodological purpose. (Doc. 106-1, p. 2). He states that the first question asked respondents whether they believed they could make the advertised number of cups using "either" of the brewing methods on the package, while the second question asked respondents who answered "No" to the first whether they believed they could make the advertised cups of coffee using one of the listed brewing methods or neither, allowing him to clarify their responses. (Doc. 88-8, p. 10-11, Doc. 106-1). The Court agrees that the questions are not literally contradictory or obviously improper. To the extent Kroger's expert believes the framing of the questions invites "demand effects," Kroger is welcome to solicit testimony

on that point at trial.

Kroger also criticizes the survey for failing to include "I don't know" or open-ended response options, forcing respondents without opinions to guess or provide answers. Once again, Dr. Sukumar has an explanation: he notes that some of the questions, including the first question, were not closed-ended questions that could lead to so-called acquiescence bias. (Doc. 106-1, p. 3). For other questions, he acknowledged that the inclusion of an "I don't know" option "can be appropriate" but felt it was not called for here because the purpose of the survey was "not to test consumers' knowledge, but their understanding of a specific representation with a limited set of options." (*Id.*). As above, the Court agrees that this issue goes to weight rather than admissibility.

In a similar vein, Kroger criticizes Dr. Sukumar for not using any "scientific controls" to adjust for biases, preexisting beliefs, guessing, or leading elements. According to Kroger, this means his survey could not "isolate the effect of the alleged overstatement from other influences." (Doc. 97, p. 8). Womick responds that the survey was not intended to measure the effect of the alleged overstatement but to test whether a cups representation was material to consumers. The effect of the alleged overstatement will be tested as part of the conjoint analysis. Based on Womick's explanation, the Court does not believe Dr. Sukumar's failure to include control questions is fatal to the admissibility of his opinions.

None of the foregoing should be read to indicate that the Court endorses each of Dr. Sukumar's choices in structuring his survey. The Court simply concludes that Kroger's criticisms do not suggest his survey departs from accepted research principles

so as to be unreliable. And the cases Kroger relies on where courts excluded survey experts involved surveys with problematic elements of a different magnitude. In *Menasha Corp. v. News America Marketing. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003), the survey's methodological flaws were obvious and severe: the universe of respondents consisted of individuals the expert knew from his work as a journalist, the expert conducted the survey himself and thus was aware of its purpose when interviewing respondents, and he did not record responses verbatim. The court in *Jackson v. National Action Financial Services, Inc.*, 441 F. Supp. 2d 877 (N.D. Ill. 2006), precluded an expert from testifying where the survey was not targeted to the correct population and the wording of a key question was too ambiguous to support the plaintiff's claim. *See* 441 F. Supp. 2d at 880-82. And *In re Fluidmaster, Inc., Water Connector Components Products Liability Litigation* involved a proposed conjoint analysis with a target universe of ordinary consumers rather than the plumbers and other professionals who made up the bulk of the subject product's purchasers. *See* No. 14-CV-5696, 2017 WL 1196990, at *29 (N.D. Ill. Mar. 31, 2017). The expert also failed to explain her choice of attributes that would comprise the study, "potentially elevat[ing] the two attributes linked to Plaintiffs' damages claims and inflat[ing] respondents' [willingness to pay] estimate." *Id.* at *31. The court recognized that "any one of these methodological issues, standing alone, might not be fatal," but it felt that the combination of issues rendered the proposed study insufficiently reliable to satisfy Rule 702. *Id.* These issues are altogether distinct from the issues Kroger raises with Dr. Sukumar's materiality survey and, again, represent flaws on a different scale than the problems it identifies.

* * *

Kroger also argues that Dr. Sukumar's testimony regarding his forthcoming conjoint analysis, documented in his second report (Doc. 88-13), is inadmissible as unreliable and irrelevant. As background, Dr. Sukumar opined that a conjoint analysis could be used to determine any overpayment associated with the purchase of the Kroger-brand coffee products at issue in this case by calculating the incremental amount consumers would pay for each additional cup of coffee advertised on Kroger's packaging. A recognized research method, a conjoint analysis attempts to ascertain how much consumers value a particular feature of a product by asking survey participants to make a series of trade-offs between products with different sets of features. (Doc. 88-13, p. 7). Using mathematical techniques, researchers can determine the value that consumers place on individual features "even when those features are not priced separately in the market." (*Id.* at pp. 7-8). Dr. Sukumar, to be clear, has not yet conducted the conjoint analysis, but his report describes how he will apply the technique in this case. (*Id.* at pp. 11-22).

Critiquing Dr. Sukumar's proposal, Kroger says that he fails to explain his choice of features that he intends to use as "distractor features," mirroring the problem with the analysis in *In re Fluidmaster*. Kroger also says that the conjoint analysis would not be helpful because it does not match Womick's liability theory, which it says requires an assessment of the specific shortfall each consumer experienced. The Court will defer its discussion of Kroger's latter concern to the class certification portion of this order. With respect to the former concern, Womick asserts that Dr. Sukumar adequately explained

how he would select the features that would make up the conjoint analysis survey.

The Court finds that Dr. Sukumar's explanations are sufficient. In his report, he writes that the best practice in conducting a conjoint analysis survey is to limit the study to six total features (the feature of interest, four distractor features, and a total price). (Doc. 88-13, p. 12). He notes that it is ideal to use distractor features "that are of similar value" to the feature of interest. (*Id.*). To select the distractors, he intends for researchers at his company to conduct five to ten interviews with shoppers at Kroger who have or considered purchasing ground coffee canisters to ask about what attributes drove their decision-making. (*Id.* at p. 13). Then, relying on his expertise, "in conjunction with the debrief on the interviews," he will select "a reasonably broad array of ground coffee canister features that would potentially include features of greater or lesser value than the number of cups of coffee that can be made." (*Id.* at pp. 13-14). These features might include caffeine content, package size, roast type, and brand. (*Id.* at pp. 14-15). Thus, contrary to Kroger's criticism that Dr. Sukumar did not offer "any rationale" for his choices, his report adequately documents how he will select appropriate distractors, largely grounded in pre-survey interview responses with coffee purchasers. The expert in *In re Fluidmasters*, in contrast, "d[id] not state why she chose these particular attributes." 2017 WL 1196990, at *30. Thus, it was not clear whether any of the selected features "play[ed] an important role in real-world consumers' preferences," resulting, potentially, in an elevated willingness to pay for the target feature. *Id.* at *31. The court also explained that conjoint analyses typically involve a first phase where respondents are asked to prioritize several product attributes; attributes valued similarly to the target

feature then become the distractor features of the actual conjoint analysis survey. *Id.* at *30 (citing *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1021 (N.D. Cal. 2013)). That method is consistent with Dr. Sukumar's proposal here, and the Court is satisfied that his proposed conjoint analysis meets the requirements for admissibility under Rule 702.

For these reasons, Kroger's motion to exclude the opinions of Dr. Sukumar (Doc. 97) is **DENIED**. Kroger's motion regarding the other experts (Doc. 96) is **GRANTED in part** as to Dr. Hendon only.

## CLASS CERTIFICATION

The Court now turns to Womick's class certification motion (Doc. 88).

1. Legal Standard

"A district court may certify a case for class-action treatment only if it meets the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b)." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017). Here, Womick seeks to certify a class under Rule 23(b)(3) and therefore must show that "questions of law or fact common to the class members predominate over any questions affecting only individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

"Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty."

*Messner*, 669 F.3d at 811 (citation omitted). Instead, they must show that the proposed class "satisfies Rule 23 by a preponderance of the evidence." *Svoboda v. Amazon.com, Inc.*, 168 F.4th 956, 961 (7th Cir. 2026).

In determining whether Rule 23 has been satisfied, a court must conduct a rigorous analysis that often overlaps with the merits of the claim since the determination "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013). Yet, courts "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811. If Plaintiffs meet the requirements of Rule 23, "the class must be certified, even if it is sure to fail on the merits." *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022).

2. Discussion

*a. Rule 23(a) Requirements*

i. Numerosity

The numerosity requirement is satisfied when the proposed class is "so numerous that joinder of all members is impracticable." *Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020) (quoting Fed. R. Civ. P. 23(a)(1)). "While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement." *Id.* at 498 (quoting *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017)).

Here, Womick has presented evidence that Kroger sold nearly nine million units of the Class Products during the proposed class period, of which approximately

1.2 million were sold in Illinois. (Blok report, Ex. 8.0, Doc. 93-1, p. 64). Womick has not ascertained the number of *individuals* who purchased these products, but it is a fair inference that the figure is substantial. And Kroger does not contest that Womick has satisfied the numerosity requirement. Accordingly, the Court finds the requirement is met.

ii. Commonality

For a class to be certified, there must be questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quotation omitted). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* Instead, the claims must depend on a "common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In other words, "[w]hat matters to class certification" is whether the class proceeding will "generate common answers apt to drive the resolution of the litigation." *Id.* (citation omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

Womick argues that the commonality requirement is satisfied here because multiple issues of fact and law shared by all class members may be resolved through classwide treatment. These include (1) whether a reasonable consumer would

understand the product labels to represent that the coffee canisters yield the number of cups of coffee stated when following the brewing instructions, (2) whether the cups representation is material to consumers, (3) whether, when following the brewing instructions, the Class Products yield the number of coffee cups stated, (4) whether the product labels are objectively likely to deceive a reasonable person, (5) whether Kroger's sale of the products is immoral, unethical, and/or unscrupulous in violation of the ICFA, and (6) whether Kroger was unjustly enriched by the payments of the Illinois class members. Womick notes that each of the states that are part of the multi-state class apply an objective standard to assess the materiality of a misrepresentation, meaning that the issue can be resolved simultaneously. Womick adds that each of these questions are subject to common evidence, as each consumer was exposed to substantively identical labels, and each claim would rely, in part, on Dr. Sukumar's consumer perception study, Dr. Schmitz's assessment of the coffee shortage in each canister, and Dr. Blok's damages methodology.

Kroger insists that Womick's analysis oversimplifies the inquiry. It argues that whether its coffee canisters yield the number of cups stated on the label could never result in a common answer because the issue turns on *how* each consumer makes their coffee, which is subject to substantial variability. Kroger also notes that Dr. Schmitz, in assessing the masses of its products, recorded measurements that if calculated under Womick's proposed "ten-cup method" would yield *more than* the number of cups stated on the label. It says that these issues would hinder the resolution of whether there was a misrepresentation at all, a question that logically precedes each of the other questions

Womick identifies. Kroger also argues that there is not common evidence demonstrating that any misstatement of the coffee yield is material to consumers, particularly where its expert, Dr. Molly Spencer, found that only about three percent of consumers surveyed mention the theme of "number of cups" in response to why they would be likely to purchase the Class Products after reviewing the labels. Kroger observes that many of the cases relied on by Womick where courts certified classes involved qualitative statements rather than quantitative ones. Where a claim regarding a product is quantitative, Kroger says, whether a consumer is deceived "is within that consumer's control." (Doc. 98, p. 24).

The Court finds that the questions identified by Womick are likely to be resolved "in one fell swoop" and thus are appropriate for resolution on a classwide basis. *Richards v. Eli Lilly & Co.*, 149 F.4th 901, 906 (7th Cir. 2025). In a similar case involving claims under the ICFA, the Seventh Circuit recognized that whether a product's packaging is likely to mislead a reasonable consumer is a common question that would not depend on each purchaser's subjective understanding. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014). This question alone is sufficient to satisfy the commonality requirement for the ICFA claim.

But there are other common questions, such as whether a purchaser who followed the directions on the Class Products would be able to make the stated number of cups of coffee and whether Kroger intended for consumers to rely on the label. *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024) (explaining that "intent" under ICFA "means that the defendant intends for the plaintiff to rely on the deception" rather than the defendant's intent to deceive under common-law fraud") (cleaned up).

And Kroger's arguments to the contrary are unpersuasive. It attempts to distinguish *Suchanek* and similar cases by arguing the representations at issue in those matters were *qualitative*, unlike the *quantitative* representations at issue here. Whether a consumer is likely to be deceived, it says, turns on the individual issue of how that person brews their coffee. Someone who likes their coffee weak, for instance, might be able to obtain *more* than the stated number of cups.

Kroger, however, does not cite any case in support of its proposed qualitative and quantitative statement distinction. More importantly, it forgets that Womick's core claim is that a consumer would fail to achieve the number of cups stated on the canister if he followed *the brewing instructions* printed on the back of the package. Whether a consumer was satisfied with the amount of coffee they were able to brew, of course, likely would be relevant to the separate question of whether a given consumer can demonstrate that the alleged misstatement proximately harmed them.

Relatedly, the accuracy of cups representation itself is a common question. (Doc. 68, ¶ 20). Kroger notes that Womick's proposed methodology for answering this question, which relies heavily on Dr. Schmitz's measurements of the Class Products, demonstrates that there is "inherent variability," such that a consumer might not experience a misrepresentation or deception at all. (Doc. 98, p. 21). For the Select Blend coffee product, Dr. Schmitz recorded three measurements where a half-cup weighed just over 36 grams. According to Kroger, if one attempted the ten-cup method with this assumed mass, no shortfall would result.

The problem with this argument requires some explanation. Recall, Dr. Schmitz attempted to find the mean mass of half-cup measurements of each of the Class Products. (Schmitz Report, Doc. 88-9, p. 2). To compute these means, he took 100 measurements from each coffee flavor—ten each from ten canisters.[8] (*Id.*). In his report, Dr. Schmitz noted that "all measurements inherently include uncertainty." (*Id.* at p. 5). When taking a measurement, "the sampled points form a distribution around the true value, which is not known." (*Id.*). And "[f]or most physical measurements," the distribution will take "the familiar bell-shaped curve from statistical analysis." (*Id.*).

For the Select Blend cited by Kroger, Dr. Schmitz determined a mean mass of 38.99 grams per half cup. (*Id.* at p. 8). Kroger's argument focuses on three low measurements, but individual measurements are not the input to Womick's shortfall methodology. That input is the average as determined by Dr. Schmitz, who accounted for the low measurements in his mean. The Court does not see the measurement variability identified by Kroger as an impediment to resolving whether the common question of whether its products misrepresent the amount of coffee that can be yielded, and it believes Dr. Schmitz's analysis is sufficiently reliable to suggest that a substantial number of consumers may experience a coffee shortfall compared to the package labels.

Kroger also argues that the materiality of the cups representation is not a common question because both its expert, Dr. Molly Spencer, and Womick's expert, Dr. Ramamirtham Sukumar, found variability among individuals in the proposed class.

[8] For the Half Caff coffee, he took a total of 40 measurements from four canisters.

Yet the materiality of a statement, for purposes of the ICFA, is judged under an objective standard. *See Mullen v. GLV, Inc.*, 330 F.R.D. 155, 162 (N.D. Ill. 2019); *Clark v. Bumbo Int'l Tr.*, No. 15 C 2725, 2017 WL 3704825, at *5 (N.D. Ill. Aug. 28, 2017). Thus, the issue is quite obviously subject to common proof. Evidence that consumers vary substantially in how important they consider the cups statement, if anything, is evidence that a reasonable consumer would not find any misstatement material, not that the issue cannot be addressed on a classwide basis. In any event, the Supreme Court has stated that a single common question is sufficient to satisfy Rule 23(a)(2), and the Court has already identified several. *See Dukes*, 564 U.S. at 359 (noting that "even a single common question will do"(cleaned up)).

iii. Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A representative "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021) (quoting *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)). Typicality "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (quoting *Lacy v. Cook Cnty.*, 897 F.3d 847, 866 (7th Cir. 2018)). "This alignment provides the assurance that, in pursuing their own claims, the representatives will also advance the interests of the class." *Gaertner v. Commemorative*

*Brands, Inc.*, No. 23-CV-02452-SPM, 2026 WL 248292, at *8 (S.D. Ill. Jan. 30, 2026) (citing *Howard*, 989 F.3d at 605).

Typicality and commonality are "closely related," both helping the court to decide whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Howard*, 989 F.3d at 606 (quoting *Dukes*, 564 U.S. at 349 n.5). "The distinction between commonality and typicality is that the commonality inquiry focuses on what characteristics are shared among the whole class while the typicality inquiry focuses on the desired attributes of the class representative." *Id.* (citation omitted).

Womick argues that his claims are typical of the class because he, and members of the putative class, were exposed to Class Products bearing uniform representations regarding the number of cups that could be brewed, and they all have uniform legal theories. Kroger counters that Womick's claim is atypical because he is subject to unique defenses. It notes that Womick admitted during his deposition that he measured his coffee using a half-cup measuring scoop, he flattened the ground coffee with his finger, and he consumed varying quantities each day. Kroger also says that Womick testified that he initially thought the coffee lasted as long as he was expecting and only later developed a "feeling" it was not going as far. It reasons that his unique experiences suggest that he may not have been deceived. Kroger also argues that the variations among the Class Products—the multiple flavors and canister sizes—are indicative of

divergent experiences among class members, particularly because Womick's own expert shows that each product resulted in a different shortfall.

The Court is not convinced that any of the factors Kroger identifies make Womick atypical. Womick testified during his deposition that he purchased Kroger's Select and Supreme Blend coffee canisters after reviewing their labels. (Womick dep., Doc. 98-1, pp. 52, 57-58). When he saw the label's statement about the number of cups that would be brewed, he though it "represented value" and that the package would yield "225 or 235 cups." (*Id.* at p. 57). His practice was to brew a ten-cup pot of coffee using a half-cup of ground coffee. (*Id.* at p. 60). At some point, he felt that the product "wasn't going as far as [he] thought it should," so he stopped purchasing it. (*Id.* at p. 44). He later spoke with a friend who, as mentioned above, put him in touch with an attorney. (*Id.* at pp. 41-42).

This experience is consistent with his theory of liability and is broadly consistent with a theory likely to be presented by any class member. *Cf. Suchanek*, 764 F.3d at 756. Kroger attempts to highlight the ways in which Womick's circumstances are atypical, but these arguments fall flat for many of the reasons highlighted by this Court when it certified the class on remand in *Suchanek*. *See* 311 F.R.D. 239, 255 (S.D. Ill. 2015). It is well-established, after all, that the typicality requirement "may be satisfied 'even if there are factual distinctions between the claims of the named plaintiffs and those of other class members.'" *Scott v. Dart*, 99 F.4th 1076, 1091–92 (7th Cir. 2024) (quoting *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009)).

And the differences Kroger identifies are immaterial. It points to Womick's testimony that there was a period after he had purchased Kroger coffee where he felt that

it lasted as long as he expected. (Womick dep., Doc. 98-1, p. 78). But if the putative class's claims are based on an objective theory of the coffee shortfall in each of the subject products, it is not clear why Womick's subjective perceptions are especially relevant. It is not as if he disclaims harm entirely. To the contrary, he testified that he "had a feeling" that the coffee was not going as far as it should within a few months of purchasing it. (*Id.* at p. 56).

Kroger also cites the fact that Dr. Schmitz recorded a half-cup measurement of 36.50 grams of the Medium Roast Select Blend, one of the products purchased by Womick. (Doc. 88-9, p. 28). According to Kroger, under Womick's mathematical theory, this means he would have yielded 237 cups, *exceeding* the 235 cups represented on the label. But, as discussed above, Kroger's analysis cherry-picks data from Dr. Schmitz's analysis and does nothing to prove that the product Womick purchased would have yielded the stated number of cups. Rather, the *mean* of the 100 samples of Medium Roast Select Blend recorded by Dr. Schmitz was 38.99 grams. (*Id.* at p. 29). According to Womick's methodology, which was not substantively challenged by Kroger, the half-cup method would yield only 222 cups of the Select Blend, undershooting the advertised yield by 13 cups. (Hendon report, Doc. 88-10, p. 7). And Kroger fails to account for Womick's testimony that he also purchased the Medium Roast Supreme Blend in addition to the Select Blend. (Womick dep., Doc. 98-1, p. 52).

On a related note, Kroger highlights that the Class Products are sold in different sizes and flavors and have differing design elements on their packaging, which it says undermines typicality. It is true that Womick intends to represent purchasers of eight

different products, but his theory—that the products were marketed in a similar way to mislead consumers to believe they would receive more coffee than they did—is the same for each product. It is undisputed that until 2025, when the labels were redesigned, each class product was marketed with a similar label that featured a representation about the number of cups that could be brewed and brewing instructions. (Doc. 88-3, p. 2). Kroger does not identify any material differences among the labels that consumers saw. Although the amount of any coffee shortfall may vary from product to product, this goes only to whether damages vary among class members, which generally does not defeat typicality. *See* 7A Wright and Miller, Fed. Prac. & Proc. Civ. § 1764 (4th ed.) (recognizing that typicality is satisfied even when "there is a disparity in the damages claimed by the representative parties and the other class members"). Typicality is satisfied here.

iv. Adequacy of Representation

Kroger also contests whether Womick is an adequate class representative. Under Rule 23(a)(4), the representative parties—both the named plaintiff and class counsel—must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

*A. Class Counsel*

Beginning with class counsel, Rule 23(g) requires a court to consider (i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). The Court may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(1)(B).

Kroger does not challenge the adequacy of class counsel, and the Court finds that counsel meets the requirements of Rule 23(g). Womick is represented by six attorneys from two law firms: Kevin P. Green, Thomas P. Rosenfeld, Daniel S. Levy, and Mark C. Goldenberg of Goldenberg Heller & Antognoli, P.C., and Mike Arias and Anthony Jenkins of Arias Sanguinetti Wang & Team LLP. Collectively, these attorneys have served as counsel in class actions across the country, with a particular emphasis on consumer protection litigation. (Resumes, Doc. 88-15). Counsel has ably represented the putative class thus far, having successfully opposed two motions to dismiss (Docs. 27, 73), a motion to strike class allegations (Doc. 37), and by compiling an extensive record in support of class certification. For these reasons, the Court finds that counsel will fairly and adequately represent the class.

*B. Womick*

Kroger does contend that Womick, as the named plaintiff, is inadequate as a class representative. "A plaintiff is adequate so long as their claims neither conflict with nor are antagonistic to those of other class members." *Gaertner v. Commemorative Brands, Inc.*, 351 F.R.D. 201, 217 (S.D. Ill. 2026) (citing *Howard v. Cook Cnty. Sheriff's Office*, 989 F.3d 587, 609–10 (7th Cir. 2021)).

Kroger first argues Womick cannot represent putative class members in the proposed multistate class because the laws of those states are "too dissimilar." Because of the Court's conclusion, below, that the multistate class cannot be certified at this time, this argument is moot.

Kroger also argues that Womick lacks a sufficient understanding of the nature of the claims in this case to adequately represent the class. It points to testimony from his deposition when he was asked to define what loss he suffered. In response, Womick stated that he "purchased a product that didn't do . . . what it said it was going to do" and "paid for something [he] didn't get." (Womick dep., Doc. 98-1, p. 134).

Kroger's concern does not persuade. A class representative does not need to "have special knowledge of the case or possess a detailed understanding of the legal or factual basis on which a class action is maintained." *George v. Kraft Foods Global, Inc.*, 251 F.R.D. 338, 351 (N.D. Ill. 2008) (citing *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 373 (1966)). Those matters are largely the responsibility of class counsel; the class representative may play a "nominal" role. *Gaertner*, 351 F.R.D. at 217. At bottom, all that is required is "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 394 (N.D. Ill. 2006) (quoting *Weiner v. Quaker Oats Co.,* 98 CV 3123, 1999 WL 1011381, at *8 (N.D. Ill. Sept. 30, 1999)).

Womick more than meets this modest standard. Contrary to Kroger's claim, his deposition testimony evinces a strong grasp of the facts underlying this lawsuit. His purchase of a "product that didn't do . . . what it said it was going to do" is the very

essence of his claim. (Womick dep., Doc. 98-1, p. 134). Elsewhere during his deposition, he explained that the coffee in this case was "alleged to yield a certain amount of cups and it didn't. It didn't perform as advertised." (*Id.* at p. 34). Womick was able to recall precisely how many cups of coffee that Kroger represented could be obtained from the products he purchased. (*Id.* at pp. 76-77). Clearly, Womick participated meaningfully in discovery.

Kroger faults Womick for not conducting his own assessment of whether the number of cups of coffee he obtained from the Class Products was accurate, instead relying only on a "gut feeling." (*Id.* at pp. 165-168). Yet Kroger never explains why this "gut feeling" is not enough to support further investigation by his counsel in this case, and it cites no authority holding that a plaintiff must undertake a personal investigation into the basis for his claims. *See Bryant v. Wal-Mart Stores, Inc.*, No. 16-24818-CIV, 2020 WL 4333452, at *19 (S.D. Fla. July 15, 2020) ("A class representative is not required to become a legal expert or independently investigate his claims."); *Guzman v. Consumer L. Grp., P.A.*, No. CV 111-187, 2014 WL 12732096, at *7 (S.D. Ga. June 6, 2014) ("Rule 23 does not require class representatives to perform their own independent investigations."); *Arango v. GC Servs., LP*, No. 97 C 7912, 1998 WL 325257, at *3 (N.D. Ill. June 11, 1998) ("Plaintiff is not, as defendants suggest, required to understand the relationships between the corporate defendants or the intricacies of FDCPA law or to conduct the pre-filing investigation personally to be an adequate class representative."). For similar reasons, Kroger's suggestion that Womick is inadequate because he does not personally know other potential class members is unavailing.

Finally, Kroger argues Womick cannot adequately represent individuals who purchased products with different flavors and in different sizes and who may brew their coffee differently than he did. This argument largely parrots Kroger's typicality arguments, and it fails for the reasons the Court explained above. Womick and the purchasers of the other Class Products share a common legal theory, and how a class member brewed their coffee is not relevant to that legal theory. The Court therefore finds that Womick is an adequate class representative.

*b. Rule 23(b) Requirements*

i. Predominance

Rule 23(b)(3)'s predominance requirement "builds on commonality" and requires that common questions predominate over individual ones. *Svoboda*, 168 F.4th at 961 (quoting *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023)). At bottom, the "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Importantly, the inquiry is qualitative rather than quantitative; a court is not to simply tally common and individual issues. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("[Predominance] is not determined simply by counting noses."). Rather, a court should "scrutinize the relationship between common and individual questions and assess their relative importance." *Svoboda*, 168 F.4th at 961 (7th Cir. 2026) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"The guiding principle . . . is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton v. SpeedyPC Software*, 907 F.3d

1018, 1029 (7th Cir. 2018) (citing *Messner*, 669 F.3d at 815). To make that assessment, the court "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Also relevant are the proofs necessary for each element, the manageability of common and individual issues at trial, and the various available procedural alternatives. *Svoboda*, 168 F.4th at 961. Furthermore, the Seventh Circuit has instructed courts to conduct a "'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Suchanek*, 764 F.3d at 760 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). The Seventh Circuit has described this analysis as involving a "peek at the merits" that is "limited to those aspects of the merits that affect the decisions essential under Rule 23." *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019).

Womick's amended complaint asserts four counts, but these claims essentially can be categorized in three buckets: claims under the Illinois Consumer Fraud and Deceptive Business Practice Act (ICFA), 815 Ill. Comp. Stat. 505/1, *et seq.*, a claim for unjust enrichment under Illinois law, and a claim asserting violations of various state consumer protection laws for the proposed multi-state class.

The parties' respective predominance arguments, understandably, are closely linked to their commonality arguments discussed above. Womick maintains the common questions regarding Kroger's liability, particularly whether the label was reasonably likely to deceive a consumer, predominate over any individualized questions, and he leans heavily on cases where courts concluded likewise for similar consumer fraud claims. Kroger, in turn, highlights individual issues it says would predominate over the

common questions. It argues that this case would involve more extensive individualized inquiries than the prior cases on which Womick relies, and it says his unjust enrichment claim faces similar problems because it requires individualized proof of a substantial injury, which may be lacking for some class members. Kroger further argues that the wide variation in state laws of the proposed multi-state class would swamp any common issues.

To state a claim under the ICFA, Womick must prove (1) a deceptive or unfair act or practice by Kroger; (2) Kroger's intent that he rely on the deceptive or unfair practice; (3) the unfair or deceptive practice occurred in the course of conduct involving the trade or commerce; and (4) Kroger's deceptive or unfair practice proximately caused him actual damage. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). "[A] statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citations omitted). And in assessing whether a practice is unfair "Illinois courts consider three factors: whether it 'offends public policy;' is 'immoral, unethical, oppressive, or unscrupulous;' or 'causes substantial injury to consumers.'" *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738–39 (7th Cir. 2019) (quoting *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014)).

Under Illinois law, there is no stand-alone claim for unjust enrichment. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). Instead, Illinois courts describe it as a condition that may be brought about by unlawful or improper conduct as defined by law, "such as fraud, duress or undue influence." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019)

(quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co.*, 484 N.E.2d 349, 354 (Ill. App. Ct. 1985)). "The request for relief based on unjust enrichment is therefore 'tied to the fate of the [ICFA] claim[.]'" *Id.* (quoting *Vanzant*, 934 F.3d at 740).

Womick argues that the first three elements of the ICFA claim are questions common to all class members and would predominate over any individualized issues. Kroger counters that whether its labels amount to a misrepresentation is an individualized question because the veracity of the claimed yield depends on a consumer's highly individualized brewing methods.

Kroger's argument is unpersuasive because its labels include brewing instructions that if followed, according to Womick's evidence, fail to produce the advertised yield. These instructions are effectively Kroger's description of the "ideal" product. Whether some class members—perhaps by departing from the instructions—were able to achieve the same number of cups of coffee as advertised is immaterial. If Womick is correct that the brewing instructions, if followed, would not yield the stated number of cups, then the cups brewed by those individuals were necessarily weaker (i.e., made with a greater ratio of water to coffee) than the product Kroger advertised. A particular consumer's idiosyncratic brewing habits therefore are irrelevant to the veracity of the statements on the labels. Individualized evidence therefore is unnecessary for a fact-finder to ascertain the accuracy of the labels.

Kroger also argues that individualized inquiries on the causation element will swamp any efficiencies from the common issues. It relies heavily on the Eighth Circuit's recent decision in *In re Folgers Coffee Marketing*, 159 F.4th 1151 (2025), where the court

reversed a district court's certification of a class that bears substantial similarities to the proposed class here. Given the significant shared facts, that case merits some discussion.

*Folgers* involved the packaging of certain coffee products sold by the Folger Coffee Company, which, as here, included a statement regarding the number of cups of coffee that could be brewed. *In re Folgers*, 159 F.4th at 1154. One of products, for instance, claimed that it made "up to 240 6 fl oz cups." The package offered consumers two brewing options: to make a single serving of coffee, it suggested mixing six fluid ounces of water with one tablespoon of coffee; for a whole pot, the container directed a consumer to use sixty fluid ounces of water and a half of a cup (eight tablespoons) of coffee. *Id.* According to the plaintiff, the former method produced "only about 70% of the cups promised." *Id.* at 1155. He claimed that the products' labels violated the Missouri Merchandising Practices Act (MMPA) and unjustly enriched the defendants at his expense. *Id.* at 1153-54. The district court certified a class of individuals who bought the subject products "in Missouri for personal, family, or household purposes." *Id.* at 1154.

Focusing on Rule 23(b)(3)'s predominance requirement, the Eighth Circuit reversed the certification decision. The court explained that its precedent demonstrated that "fraud cases are typically unsuitable for class treatment . . . . because the proof required in such cases often varies with respect to what representations consumers received and whether those consumers relied on those representations." *Id.* at 1155 (citing *In re St. Judge Med., Inc.*, 522 F.3d 836 838 (8th Cir. 2008)). The court indicated that individual issues would "swamp any efficiencies" a class action might provide, rendering certification inappropriate. *Id.* at 1156. These individual issues included whether

members of the proposed class read the representations on the packages, cared about them, and interpreted them in the same way as the plaintiff. *Id.* The plaintiff's unjust enrichment claim failed for similar reasons; as the court noted, "[w]hether a particular transaction might be considered inequitable or unjust turns on the specific circumstances." *Id.* at 1158.

Kroger argues that the Eighth Circuit's reasoning applies equally to this case, as the Missouri statute at issue there requires similar proof of causation to the ICFA. Although the facts of *Folgers* share significant overlap with Womick's theory of the case, the Court is not convinced that it dictates the same outcome. *See OSF Healthcare Sys. v. Insperity Grp. Health Plan*, 82 F. Supp. 3d 860, 865 (C.D. Ill. 2015) (recognizing that out-of-circuit precedent is not binding but "is entitled to respectful consideration"). Rather, the Seventh Circuit's decision in *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014), is on point and governs the resolution of this case.

In that case—which arose out of this district[9]—a group of plaintiffs brought suit under the consumer protection laws of eight states after discovering that the defendants' Keurig machine-compatible coffee products contained (primarily) instant coffee rather than ground coffee. *Suchanek*, 764 F.3d at 752-53. Several expert surveys in the record suggested that few consumers were able to tell that the defendants' product was instant coffee from its label. *Id.* at 753. The district court ultimately declined to certify a class.

[9] The case was assigned to the Honorable G. Patrick Murphy, who handled the initial class certification proceedings, but was reassigned to the undersigned on remand from the Seventh Circuit after Judge Murphy's retirement.

The Seventh Circuit reversed, holding in part that the district court's predominance analysis was too strict. *Id.* at 755. Notably, the district court had ruled that individual issues predominate "in cases requiring individual subjective inquiries into causality." *Id.* at 759. That statement was error, the Seventh Circuit explained, because "[e]very consumer fraud case involves individual elements of reliance or causation," but the district court's rule would "eviscerate" plaintiffs' ability to bring such cases. *Id.* Instead, the inquiry should focus on "the difficulty and complexity of the classwide issues as compared with the individual issues," for the individual issues and associated evidence often "will be simpler and more accessible to individual litigants." *Id.* at 760. These individual issues can be "'readily determined' in follow-on proceedings." *Id.* (citing *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013)). Resolving the common issue of whether the defendants' packaging was likely to mislead might have required "costly survey evidence and expert testimony," but if the class prevailed on that issue, it would be a "straightforward matter for each purchaser to present her evidence on reliance and causation." *Id.*

*Suchanek* therefore suggests that certification *might* be possible in a case like this one. The Eighth Circuit's rejection of a similar class in *Folgers* appears to have been driven by an application its precedents with respect to the balance between individual and common issues in consumer fraud cases. *In re Folgers*, 159 F.4th at 1155. The Seventh Circuit, however, has struck a different balance and expressly suggests that presenting proofs on the individualized issues could be a "straightforward matter" "[a]t the back end" of the litigation. *Suchanek*, 764 F.3d at 760. Indeed, just this year, the court reiterated

that predominance is not defeated by a phase of trial "requiring individual presentations of proof on all (or part of) an element of a claim." *Svoboda*, 168 F.4th at 964.

Kroger insists that *Suchanek* is distinguishable. It says Womick's allegations are focused on a "subjective measure of the product's performance" and a "highly individualized" assessment of the quantity a consumer received rather than the "binary" issue in *Suchanek* of whether a consumer believed the product contained ground coffee or not. (Doc. 98, p. 18). Therefore, according to Kroger, the court (or a fact-finder) will have "to determine the number of cups that a consumer yielded from their coffee purchase [and] whether each class member ultimately got what they bargained for." (*Id.*).

Respectfully, the Court fails to see the distinction. Of course, individualized proof of damages and causation is required for any plaintiff to prevail. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010); *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149, 776 N.E.2d 151, 160 (2002). Thus, each plaintiff will have to demonstrate that they suffered a loss on account of Kroger's alleged misrepresentation. But that inquiry is not nearly as complex as Kroger believes. A consumer would only need to demonstrate that he or she relied on Kroger's claim regarding the yield of its products in determining whether to purchase it. *See Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 768 (S.D. Ill. 2010). Kroger's insistence that the number of cups of coffee a consumer actually made from the Class Products is relevant to this inquiry misses the mark. After all, a consumer who managed to achieve the stated number of cups from one of the Class Products might, if Womick is correct, have received a weaker cup of coffee from the one Kroger marketed (as recommended by the brewing instructions), much in the way the plaintiffs in *Suchanek* received a

different form of coffee—instant coffee—than they intended to purchase. Such a consumer rationally could have assumed, given the product label and a preference for weak coffee, that he or she would be able to make *more than* the number of cups stated on the package. Similarly, some of the class members in *Suchanek* may also have been satisfied with the way the instant coffee tasted. The Court believes that Womick's claim falls squarely within the logic of *Suchanek*. In any event, the Seventh Circuit has rejected the idea that "no class can be certified until proof exists that every member has been harmed." *Suchanek*, 764 F.3d at 757.

Beyond the common liability issues, Womick—through the opinions of Dr. Sukumar and Mr. Blok—has a viable damages methodology, so the Court finds that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. As discussed above, Dr. Sukumar intends to conduct a conjoint analysis to determine the market's willingness to pay ("MWTP") per cup of coffee, i.e., the incremental amount a consumer would pay for each additional cup advertised on the packaging. Mr. Blok then proposed calculating class members' actual damages from the shortfall by multiplying the MWTP by the shortfall volume for each class product. (Doc. 93-1, ¶ 30). He offered two alternative ways to calculate the shortfall volume: taking either the average shortage between the one-cup (tablespoon) and ten-cup (half cup) brewing methods or using the ten-cup shortage figures alone. (*Id.* at ¶ 26).

Kroger disputes that this method is sufficient. Although it concedes that a conjoint analysis is a recognized method for ascertaining damages in many class action suits, it argues the method is inappropriate for the claim here, which focuses on the *amount* of

product represented rather than the type or a specific feature. Kroger cites no authority for that proposition, however, and its relevant consumer survey rebuttal witness, Dr. Molly Spencer, offers no opinions on Dr. Sukumar's proposed conjoint analysis. (Doc. 97-1, ¶ 2). Dr. Sukumar, for his part, opines that a conjoint analysis "can determine the value that consumers place on individual features of a product (even then those features are not priced separately in the market)." (Doc. 88-13, p. 8). There is no obvious basis to think that a conjoint analysis can accurately assess the value a consumer places on a particular feature but cannot value a particular size or quantity of a product.

Kroger also cites several cases where courts "have rejected" damages models if they are "not consistent with the plaintiff's theory of liability." (Doc. 98, p. 27). Each of these cases is distinguishable or inapt.

*In re Fluidmaster, Inc., Water Connector Components Products Liability Litigation*, No. 14-CV-5696, 2017 WL 1196990, at *57 (N.D. Ill. Mar. 31, 2017), involved a model that did not match the plaintiffs' liability theory, which was that the defendant had omitted material information about a product's propensity to fail, and assessed a willingness to pay for a different product attribute that "provide[d] no insight into the value of the product that consumers ultimately received." In *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 541, 554-55 (N.D. Cal. 2021), it was undisputed that the proposed conjoint analysis would not isolate the price premium from the challenged representations regarding the source of the vanilla flavoring in the defendant's ice cream product and there was not other evidence in the record regarding consumer beliefs as to the meanings of those representations. And in *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010,

1049 (C.D. Cal. 2018), the court found that the model suffered from "focalism bias," a problem where survey respondents "pay more attention to a product attribute or feature in the choice exercises than they ordinarily would in the actual purchase process, thus increasing the apparent relative subjective value they assign to the attribute." There is no indication that Dr. Sukumar's analysis will suffer from similar issues.[10]

Kroger notes that respondents to Dr. Sukumar's materiality survey varied in how much importance they ascribed to the number of cups that can be brewed with a single canister of the subject coffee. They also point to Dr. Sukumar's deposition testimony indicating that consumers weigh price, flavor, and cup count differently based on their personal preferences and how the label is worded. It adds that its expert, Dr. Spencer, found that the cups representation was not material to many purchasers. Kroger does not explain, however, why these factors would necessarily make a conjoint analysis assessing the MWTP unreliable for measuring classwide damages. After all, the purpose of the conjoint analysis is not to assess the most important features of a product but to isolate and "determine the value that consumers place on individual features of a product." (Sukumar report, Doc. 88-13, p. 8).

Kroger also notes that Womick's damages model would award damages to any class member, irrespective of whether they cared about the cup representation. That

[10] The Court recognizes that Dr. Sukumar's analysis has not yet been completed. Although courts largely have sanctioned the practice of deferring the completion of conjoint analysis studies until after class certification, *see supra* n.6, this Court finds it to be on shaky ground to the extent it limits a defendant's ability to meaningfully challenge the reliability of the expert's opinions before class certification. Accordingly, once Dr. Sukumar completes his conjoint analysis, Kroger may bring any issues with the results affecting the maintainability of the class to the Court's attention by pre-trial motion.

argument is essentially a critique of the class definition. But the Seventh Circuit has definitively rejected the idea that class certification requires proof that every class member has been harmed. *Suchanek*, 764 F.3d at 757. Although Womick's proposed damages model presently computes damages for all purchasers, it likely will be a straightforward mathematical exercise to modify the model to compute damages for only those class members who ultimately prove their claim.

In a last-ditch effort, Kroger asserts that damages are immeasurable on a classwide basis because consumers would have experienced a range in shortfalls based on their brewing method. But as the Court explained above, if Womick is correct, to the extent any consumer did not experience a shortfall, it was because they brewed a weaker cup of coffee than the one Kroger marketed. Womick's damages model appropriately assesses what consumers would have paid for a product that provided as much coffee of the kind marketed. *Suchanek*, 764 F.3d at 760 ("[F]or example, plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the pods contained real coffee grounds)."); *see also Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) ("[A]ctual loss may occur if the seller's deception deprives the plaintiff of "the benefit of her bargain" by causing her to pay "more than the actual value of the property.").

The Court finds that Womick has met his burden of showing a proposed classwide damages model that is consistent with his theory of liability. *See Comcast*, 569 U.S. at 38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (citation omitted). The Court

therefore finds the proposed class's ICFA claim satisfies the predominance requirement, as does the unjust enrichment claim, which is governed by the same logic.

* * *

The Court's analysis is not identical for the proposed multistate class. Kroger argues that the wide variety of elements, standards, and remedies that apply to the consumer protection statutes of the 22 states stand as a bar to certification. Kroger observes that the states have varying statutes of limitations, intent requirements, and remedies. Womick insists, however, that each of the states represented in the proposed multi-state class employs an objective standard to determine whether a challenged representation is deceptive. Thus, the central questions of whether Kroger's coffee products shorted consumers and whether its labels were likely to deceive a consumer are common across all states and remain predominant.

Initially, the Court is not convinced that the varying damages remedies and limitations periods defeat predominance. Mr. Blok already accounted for each state's limitations period in his report and described how he would calculate statutory and treble damages remedies available in some of the states. (Doc. 93-1, p. 72). And courts regularly hold that varying statutes of limitations (as well as their applicability to particular class members) are no bar to class certification. *See Saltzman v. Pella Corp.*, 257 F.R.D. 471, 486 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010); *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1017 (N.D. Ill. 2020) (citing *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)); *In re Turkey*

*Antitrust Litig.*, No. 19 C 8318, 2025 WL 264021, at *29 (N.D. Ill. Jan. 22, 2025). The limitations periods could also be spelled out specifically in a modified class definition.

But other variations cause more concern. Kroger, for its part, notes that eight of the subject states—Colorado, Kansas, Kentucky, Michigan, New Mexico, Oregon, Utah,[11] and Virginia—impose heightened scienter requirements. (Doc. 98, p. 34 n.14). And several states permit statutory or treble damages or additional attorney's fees based on a finding that the defendant's conduct was willful. (*Id.*, p. 35 n.15). Courts have noted that these types of substantive variations among state consumer protection laws pose difficulties for certifying multistate classes. *See Palomar v. SMC Corp. of Am.*, No. 119CV04693RLYMJD, 2021 WL 5364150, at *7 (S.D. Ind. Sept. 27, 2021) ("[F]ederal courts frequently decline class certification when the laws of different states would apply to individual class members' claims."); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 584–85 (N.D. Ill. 2008) (recognizing that variations in state consumer protection laws pose difficulties to class certification).

Of course, "[c]omplexity is not usually an appropriate ground for refusing to certify a class." *In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211, 217 (N.D. Ill. 1980). From experience, this Court recognizes that multi-state class actions can be managed. *See Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565-NJR-RJD, 2018 WL 6617106, at *16 (S.D. Ill. July 3, 2018) (discussing trial plan after certification). But that case involved only eight states, standing in sharp contrast to the 22 states at issue here. And similar classes likewise

[11] Kroger's discussion of Utah law is curious, as it is not one of the states included in the proposed multistate class.

have involved fewer states. *See Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *10 (N.D. Ill. Nov. 16, 2021) (ten states).

Seeking to overcome this hurdle, Womick attached a chart outlining the elements of each state's statutory consumer protection claim. (Doc. 88-14). The chart cites caselaw suggesting that each of the states, with the possible exception of Arizona, uses a reasonable consumer standard to determine whether a statement is deceptive. Nevertheless, the chart makes plain several variations of concern to the Court. Illinois, for instance, requires plaintiffs to prove that a defendant intended for a consumer to rely on a particular representation, a feature not shared by many of the other states. *See Murrow v. Quincy Bioscience Holding Co., Inc.*, No. 23-CV-14893, 2025 WL 446149, at *4 (N.D. Ill. Feb. 10, 2025) ("Under ICFA, intent means that the defendant intends for the plaintiff to rely on the deception, as opposed to the defendant's intent to deceive."); *Laurens v. Volvo Car USA, LLC*, No. 218CV08798JMVCLW, 2020 WL 10223641, at *12 (D.N.J. Dec. 8, 2020) (declining to find predominance on account of this variation).

As Kroger points out, the states vary in the required intent a plaintiff must prove. New Mexico, for example, appears to require proof that a defendant's false or misleading representation was "knowingly made." *Salas v. Guadalupe Credit Union*, 2025-NMSC-006, ¶ 48, 563 P.3d 873, 887 (N.M. 2024). Kansas, however, permits liability if an individual knows or has "reason to know" of the relevant misstatement. *Kucharski-Berger v. Hill's Pet Nutrition, Inc.*, 60 Kan. App. 2d 510, 516, 494 P.3d 283, 289 (Kan. Ct. App. 2021) (citing Kan. Stat. Ann. § 50-626(b)). And there are other differences. Several of the states, including, Colorado, Nebraska, South Carolina, and Washington require a plaintiff to

demonstrate that the alleged deception "affected to public interest" or some variation thereof. *See Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 98 (Colo. 2011) (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)); *Eicher v. Mid Am. Fin. Inv. Corp.*, 275 Neb. 462, 473, 748 N.W.2d 1, 12 (Neb. 2008); *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (S.C. Ct. App. 2006); *Montes v. SPARC Grp. LLC*, 6 Wash. 3d 321, 330, 586 P.3d 999, 1004 (Wash. 2026). And in North Carolina, the question of whether an act is unfair or deceptive "is a question of law for the court." *Kelly v. Georgia-Pac. LLC*, 671 F. Supp. 2d 785, 799 (E.D.N.C. 2009); *Suchanek*, 2018 WL 6617106, at *16.

This is not to say that a multi-state class *could not* be certified. District courts, after all, are no strangers to procedural measures needed to bring resolution to complex cases. *See Anderson Living Tr. v. ConocoPhillips Co., LLC*, 349 F.R.D. 365, 420 (D.N.M. 2025) (noting that "[d]istrict courts have myriad tools for managing a class and can design new tools to suit the needs of individual cases."); *see also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015) ("District courts have considerable experience with and flexibility in engineering solutions to difficult problems of case management."). Here, for example, a special verdict form could allow a jury to make findings as to whether the class proved varying levels of scienter. And the Court is not convinced Kroger is correct in some of its assessments regarding the varying state laws. It lists Michigan as a state that requires plaintiffs to establish a defendant's intent, but this does not appear to be an accurate statement of the law. *See Brownlow v. McCall Enters., Inc.*, 315 Mich. App. 103, 125-26, 888 N.W.2d 295, 306-07 (Mich. Ct. App. 2016) (observing that the statute's language does not impose a scienter requirement).

But on the whole, Womick's submissions, although a useful starting place, are insufficient for the Court to conclude that the predominance requirement is satisfied for the proposed multi-state class. He does not explain why the obvious variations discussed above are inconsequential or how they could be managed if not, nor has he offered suggestions for other viable groupings of states. Where a plaintiff seeks certification of a class asserting claims under the laws of multiple states, he "bear[s] the burden of conducting a 'rigorous analysis' of the relevant laws of the states at issue." *Ortiz v. Saba Univ. Sch. of Med.*, 348 F.R.D. 4, 13 (D. Mass. 2024); *see also Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 332 (S.D. Ill. 2009) ("The burden of proof on the requirement that choice of law and conflict of law issues not present any predominance or manageability issues rests squarely with the plaintiff."). The Court will not expend its energies sifting through the laws of 22 states to convince itself certification is possible where the plaintiff has not made a reasonable attempt to do so in the first instance.[12]

In a footnote, Womick asks, in the event the Court declines to certify his proposed classes, to certify "the common issues" under Rule 23(c)(4). That rule authorizes a court to certify a class "with respect to particular issues." Fed. R. Civ. P. 23(c)(4). As further explained below, the Court will certify Womick's claims that arise under Illinois law but not those under the laws of the other states of the proposed multistate class. To the extent that Womick believes a Rule 23(c)(4) issue class is appropriate as to some issue or issues

[12] Although some variations might be addressed by dividing the multi-state class into subclasses, *see* Federal Rule of Civil Procedure 23(c)(5), Womick has not explained how the subclasses should be divided. Also problematic—because Womick is the sole named Plaintiff, many of the subclasses would lack an adequate representative.

pertinent to these claims, the Court does not believe his brief footnote is sufficient to demonstrate that "certifying the proposed issues would be the most practical and efficient way to resolve the litigation," *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 898 (7th Cir. 2024), so the issue is waived.

Accordingly, the Court finds that the proposed multistate class does not satisfy Rule 23(b)(3)'s predominance requirement. The Court is satisfied, however, that common issues predominate with a class of Illinois purchasers limited to the claims arising under state law.

ii. Manageability and Superiority

Womick must also establish that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule lists four factors relevant to the analysis:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Kroger argues that Womick has not met his burden, largely repeating its predominance arguments. This is to be expected, as the inquiries overlap. *See Svoboda*, 168 F.4th at 962. Given the Court's conclusion above that individual issues do not predominate and that a multi-state class is not certifiable at this time, Kroger's concerns are not availing. *See Messner*, 669 F.3d at 815 n.5 (explaining that the presence of many

common issues of law and fact means that "the superiority requirement likely poses no serious obstacle to class certification.").

Instead, the Court agrees with Womick that a class action would be superior to other methods of litigating this dispute. The damages available to each individual Illinois plaintiff are likely to be small—so small that it would be irrational for individuals to litigate these claims on their own. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). As this Court has observed previously, the types of evidence needed to litigate the common issues in this case, such as survey evidence and expert testimony, likely would cost more than any individual claim is worth. *Suchanek*, 311 F.R.D. at 259. The Rule 23(b)(3) class action was intended to solve this exact problem, as the Seventh Circuit repeatedly has emphasized. *See Suchanek*, 764 F.3d at 759.

Moreover, concentrating the Illinois claims at issue in this litigation in this district is more desirable than litigating them in some alternative forum, and the Court does not anticipate that the class, as limited to residents of Illinois, would be especially difficult to manage. *Cf. id.* at 760 ("At the back end, if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation."). The Court therefore finds that the proposed Illinois class meets Rule 23(b)(3)'s superiority requirement.

*c. Class Definition*

The Seventh Circuit has long required that a class definition be clearly defined by "objective criteria" and not so that membership depends on a finding of liability. *See Mullins*, 795 F.3d at 659-60. Kroger criticizes Womick's proposed class definition as "unascertainable" and "insufficiently defined" because it includes individuals who "were not and could not have been deceived" by the representations on the Class Products. Kroger is correct that the Seventh Circuit has recognized that a class definition can suffer from overbreadth, particularly if "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner*, 669 F.3d at 824. However, the court of appeals has taken pains to distinguish between cases involving proposed classes with "members who *were not* harmed" and those whose members "*could not* have been harmed." *Id.* at 825; *see also Suchanek*, 764 F.3d at 758. After all, class certification does not require proof that *every* class member has been harmed. *Suchanek*, 764 F.3d at 757. But the distinction is critical, according to the Seventh Circuit, because the settlement pressures faced by class action defendants "can be magnified unfairly if it results from a class defined so broadly as to include many members who could not bring a valid claim even under the best of circumstances." *Messner*, 669 F.3d at 825. Accordingly, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC,* 571 F.3d 672, 677 (7th Cir. 2009).

Kroger insists that the present class definition is improper because some consumers may have been able to brew the stated number of cups of coffee out of the Class Products, and other consumers may have purchased the products aware that they allegedly do not contain sufficient ground coffee to yield the amount stated on the label. It also points to survey evidence of consumer preferences that it says establishes that there are many consumers who do not care about the cup representation at all.

The issues Kroger identifies do not preclude certification. The Court has already rejected versions of the first argument, and the others fare little better. If a consumer was aware that the statement on the Class Products was inaccurate, he or she would not be able to prevail on liability. Thus, this is not an argument "for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate" Kroger. *Butler*, 727 F.3d at 799. Kroger's survey argument also does not persuade. Womick's expert, Dr. Sukumar, found that 77% of respondents stated that the number of cups of coffee that can be made from a canister is an "important factor" to their purchasing decision and that, of these individuals, 98.4% considered the inclusion of the number of cups that can be made on a product label "of some importance" in their purchasing decision. (Sukumar Consumer Materiality Report, Doc. 88-8, pp. 6-7, 15). Kroger's expert, Dr. Molly Spencer, identifies several flaws with Dr. Sukumar's study, some of which strike the Court as reasonable. But even under her own study, where participants were shown the class product label at issue in this case, somewhere between 30 and 37% of Illinois respondents identified the cups representation on the Class Product labels as a factor in their decision of whether they were likely to purchase the product. (Spencer

Rebuttal Report, Doc. 98-3, p. 76). Simply put, this is not a situation where "few, if any, of the putative class members share the named representative's grievance against the defendant." *Suchanek*, 764 F.3d at 758.

The cases cited by Kroger do not suggest that certification is inappropriate. In *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 509 (7th Cir. 2006), the plaintiff claimed to have been deceived into believing that fountain Diet Coke and bottled Diet Coke contained the same sweeteners. The district court denied class certification of the plaintiff's proposed class of "[a]ll individuals who purchased for consumption and not resale fountain Diet Coke," and the Seventh Circuit affirmed, emphasizing that the "class could include millions who were not deceived and thus have no grievance under the ICFA." *Oshana*, 472 F.3d at 514. Here, in contrast, the record establishes that the proposed class includes many individuals for whom the cups representation was material to their purchasing decision.

In *Williamson v. S.A. Gear Co., Inc.*, No. 15-CV-365-SMY-DGW, 2018 WL 2735593, at *7 (S.D. Ill. June 7, 2018), the plaintiffs failed to identify any evidence suggesting that anyone other than themselves believed the subject auto part to be defective or the defendant's statements about it misleading. In *Morr v. Plains All American Pipeline, L.P.*, No. 17-CV-163-SMY, 2021 WL 4554659, at *3 (S.D. Ill. Oct. 5, 2021), the plaintiffs sought certification of a class consisting of "[a]ll owners or lessees of residential properties" in certain communities near the site of an oil spill. Rejecting the proposed class definition, the court observed that the proposed class was comprised "almost entirely" of property owners whose properties did not abut the path of the spill and had no defined physical injury. *Id.* at *4.

*Korte v. Pinnacle Food Groups LLC*, No. 17-CV-199-SMY-MAB, 2019 WL 4305464, at *2 (S.D. Ill. Sept. 11, 2019), may be the most similar to this case but ultimately is of no help to Kroger. There, a plaintiff claimed that a salad dressing label led him to believe the product contained only Extra Virgin Olive Oil, even though it also contained water and soybean oil (facts specified on the back of the label). He sought to certify a class consisting of all Illinois and Missouri purchasers of the salad dressing for a specified period. *Korte*, 2019 WL 4305464, at *2. But during the proposed class period, the defendant amended the label to make clear that the dressing was made with a "blend of oils." *Id.* at *3. Because the class definition included individuals who clearly would not have been deceived by the label, the court held that the class definition was overbroad. *Id.* Elsewhere in its opinion, the court framed the issue as a problem of the named plaintiff's adequacy, explaining that the record suggested that "no other potential class members share[d] [his] grievance." *Id.* at *6. The record in this case is not similarly threadbare. Based on the record produced by the parties, it is likely that many, even if not a clear majority, of purchasers of the Class Products relied, at least in part, on Kroger's allegedly faulty representations regarding the number of cups of coffee that could be obtained.

But *Korte* does highlight a potential overbreadth issue. Kroger notes that it took the cups representation off the Class Products in the Spring of 2025, so consumers who purchased the products after that date could not have been harmed. (David M. Schroeder dep., Doc. 88-4, p. 34; Adam Young dep., Doc. 98-7, p. 91). Womick submits, however, that Kroger did not act to remove the products bearing the old label from store shelves and that the present class definition addresses this problem by defining the Class

Products only to include the coffee canisters with a cups representation. Kroger pushes back that "many" of the products were identified by the same UPC—a unique numerical identifier—before and after the label change, so it will be impossible to verify whether a consumer purchased a product that contained the representation or not.

The Court recognizes Kroger's concern but does not see the relabeling as a barrier to ascertaining the identities of class members. Somewhat fortuitously, the record suggests that Kroger changed the names of five of the six flavors of Class Products when it altered the labels. (Ex. 8, Schroeder dep., Doc. 88-4). Thus, the class definition already excludes most individuals who would not have seen a cups representation. One of the Class Products, "Special Roast," did not receive a name change, but the Court does not believe any modification is required to account for individuals who may have purchased this product after the cups statement was removed. The record reflects that the label was not changed until April 21, 2025, and it is undisputed that products with the old labels were not removed from store shelves. It likely took weeks, if not months, before consumers stopped seeing the old Special Roast label on the shelves. The class period here begins on May 12, 2016, based on the applicable statute of limitations period for the unjust enrichment claim, which is two years longer than the ICFA claims. (Doc. 88, p. 14). And the period will close on the date of this Order. Thus, only a small fraction of total purchasers may have been exposed to the new label, mitigating overbreadth concerns. It also bears repeating that the class is defined such that only purchasers of products with a cups representation are members. This situation therefore is distinguishable from *Korte*, where the product label was changed approximately halfway through the proposed class

period. *See Korte*, 2019 WL 4305464, at *3. Kroger, of course, may challenge particular purchasers of the Special Roast later in the litigation, but the Court is not persuaded that the class definition—as set out below—is overbroad.

## CONCLUSION

For these reasons, Kroger's motion to exclude Womick's class certification experts Dr. Schmitz, Dr. Hendon, and Mr. Blok (Doc. 96) is **GRANTED in part** as to Dr. Hendon. The remainder of the motion is **DENIED**. Kroger's motion to exclude the opinions of Dr. Sukumar (Doc. 97) is **DENIED**.

Moreover, as set forth above, the Court finds that Womick has satisfied the requirements of Rule 23 by a preponderance of the evidence as to a class of Illinois purchasers. His motion for class certification (Doc. 88) therefore is **GRANTED in part**. The Court certifies the following class under Rule 23(b)(3) for the ICFA and unjust enrichment claims (Counts I-III):

> All individuals who purchased one or more of the Class Products during the Class Period, May 12, 2026, through the date of this order, in the state of Illinois.
>
> The Class Products are defined as follows: Kroger-brand Medium Roast Select Blend (30.5 oz.), Medium Roast Supreme Blend (29 oz.), Medium Roast Special Roast (29 oz.), Medium Roast 50% Less Caffeine Lite (24 oz.), Medium Roast Premium Blend (11.5 oz. and 29 oz. sizes), and Medium Roast Decaf Classic (11.5 oz. and 25 oz. sizes) coffee canisters that contained a label specifying the number of cups of coffee that each could yield.
>
> Excluded from the Class are any employee of Defendant, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

The Court **APPOINTS** Kevin P. Green, Thomas P. Rosenfeld, and Daniel S. Levy of Goldenberg Heller & Antognoli, P.C. and Mike Arias and Anthony Jenkins of Arias Sanguinetti Wang & Team LLP as class counsel. Plaintiff Anthony Womick is hereby designated as class representative.

The parties **SHALL** meet and confer regarding a proposed form of class notice and submit it to the Court **on or before October 14, 2026**.

**IT IS SO ORDERED.**

**DATED: September 29, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**